UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| VICTORIA GRETZKY,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>AMGUARD INSURANCE COMPANY,<br><br>　　　　　Defendant. | CIVIL ACTION NO. 2:25-cv-10267-NMG |

**AMGUARD INSURANCE COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO LIMIT DAMAGES UNDER M.G.L. C. 93A, § 9**

The Defendant AmGUARD Insurance Company ("AmGUARD") hereby moves this Court for an Order declaring that: (1) the offer of settlement made in AmGUARD's response letter to the Plaintiff's M.G.L. c. 93A/c. 176D demand was reasonable; and (2) AmGUARD is entitled to the protections afforded by the safe harbor provision of M.G.L. c. 93A, § 9, limiting the Plaintiff's potential damages to $232,769.16. Accordingly, for the reasons set forth herein, AmGUARD has established that it is entitled to the safe harbor protections of M.G.L. c. 93A, § 9.

**FACTUAL BACKGROUND**

**I.    The Underlying Action**

This matter arises from an underlying tort case captioned as *Victoria Gretzky v. Manuel Arruda, et al.*, Civil Action No. 2273CV00595, Bristol County Superior Court (the "Underlying Action"). In the Underlying Action, the Plaintiff alleged that she suffered serious bodily injuries after she fell at an apartment owned by Manuel and Madalena Arruda (collectively, the "Arrudas"). AmGUARD issued a liability policy to the Arrudas which provided $1 million in liability coverage per occurrence. Relevant to the instant Motion, counsel for the Arrudas provided Plaintiff's

1

counsel with the AmGUARD policy (thus disclosing the limits of liability) on or around November 7, 2022. On November 21, 2022, the Plaintiff's counsel sent a letter to the Arrudas' counsel alleging violations of c. 93A and demanded $1 million (the limit of liability) in settlement of her claims. Thereafter, as the Underlying Action progressed, AmGUARD made several offers through direct negotiations between counsel. Specifically, AmGUARD made an initial offer of $60,000 on or around February 29, 2024, a subsequent offer of $100,00 on or around April 22, 2024, another offer of $200,000 on or around May 2, 2024 and a $700,000 offer on or around May 7, 2024. All the while, the Plaintiff did not reduce her policy limits demand and rejected a proposal to mediate the Underlying Action. Negotiations continued and the Arrudas' counsel thereafter offered the full $1 million policy limit, as memorialized in an email from the Arrudas' counsel to Plaintiff's counsel on May 9, 2024 which stated:

> Greg-
>
> This will confirm you have proposed settlement as follows:
>
> 1. AmGuard pays your client $1 million to release the defendants and any policyholders.
> 2. AmGuard will not be on the release.
> 3. The parties will report the case settled by 2 pm tomorrow.
> 4. There will be no trial on [the Underlying Action]. Your client is free to bring an action against AmGuard for any alleged violations under Chapters 93A/176D.
>
> Please confirm this is what Ms[.] Gretzky will accept and I'll report it to the carrier immediately.

Plaintiff's counsel responded by letter on May 9, 2024 disputing the Arrudas' counsel's characterization of this proposal and ostensibly rejecting it. On May 14, 2024, the Plaintiff and the Arrudas filed a "consent judgment" which provided:

> IT IS ORDERED, ADJUDGED AND DECREED that a judgment of liability is hereby entered against Manuel Arruda and Madalena

Arruda in favor of Victoria Gretzky in the amount of $2,250,000.00,
exclusive of interests and costs[.]

The consent judgment also assigned any rights the Arrudas had under M.G.L. c. 93A and/or c. 176D to the Plaintiff and further provided that the Plaintiff would receive the limit of liability of the AmGUARD policy and would not seek to collect the remaining amounts from the Arrudas. The Court endorsed the consent judgment on June 24, 2024. AmGUARD paid the $1 million limit of liability on August 8, 2024.

## II.    The M.G.L. c. 93A Demand and Settlement Offer

On August 13, 2024, the Plaintiff served a demand letter on AmGUARD pursuant to M.G.L. c. 93A, § 9 alleging violations by AmGUARD of M.G.L. c. 176D, § 3(9)(a)-(d), (f) and (n). *See* **Ex. A**. In her demand letter, the Plaintiff demanded:

- Payment of prejudgment interest on the part of the "judgment" owed by AmGUARD;
- Payment of three times the total "judgment" against its insureds, $6,750,000.000, for AmGUARD's willful and knowing statutory violations; and
- Payment of attorneys' fees in the amount of $1,500,000.

*See* **Ex. A**. AmGUARD responded on September 12, 2024 by making a settlement offer of $232,769.16. *See* **Ex. B**. As set forth in AmGUARD's response letter, the settlement offer denied any liability under M.G.L. c. 93A or c. 176D, but to resolve the matter, offered the Plaintiff $232,769.16 based on her alleged loss of use of the $1 million policy limits at an interest rate of 12% from September 1, 2022 (the date the Underlying Action was filed) to August 8, 2024 (the date the check for $1 million was received by Plaintiff's counsel). Said "loss of use" damages are, if any, the proper measure of damages where a c. 93A claim is based on an alleged violation of c. 176D; indeed, as the Massachusetts courts have made clear, and as set out herein, a personal injury plaintiff's c. 93A injury is not the personal injury itself, nor is it a judgment in an underlying tort

case but rather, it is the loss of use of money. The Plaintiff filed the instant lawsuit against AmGUARD on November 21, 2024.

Plaintiff's counsel sent another demand letter pursuant to M.G.L. c. 93A, § 9 to AmGUARD on January 31, 2025 ostensibly alleging "first party" violations of c. 176D. *See* **Ex. C**. However, the January 31, 2025 demand letter was nearly identical to the Plaintiff's August 13, 2024 demand letter. AmGUARD responded to the January 31, 2025 demand letter on February 28, 2025. *See* **Ex. D**. In its response letter, AmGUARD again denied liability under c. 93A and/or c. 176D and reiterated its offer of $232,769.16.[1] The Plaintiff's counsel formally rejected AmGUARD's settlement offer in a telephone call on April 11, 2024.

## ARGUMENT

### I.    The Statutory Scheme

The Plaintiff alleges violations of M.G.L. c. 176D, §3(9) concerning unfair claims settlement practices. There is, however, no private right of action under c. 176D. *See Silva v. Steadfast Ins. Co.*, 87 Mass. App. Ct. 800, 803 (2015) ("However, c. 176D, § 3, does not itself provide a private right of action."). Any claim that the Plaintiff has must be brought under M.G.L. c. 93A. *See Aquino v. Pacesetter Adjustment Co.,* 416 F. Supp. 2d 181, 192 (D. Mass 2005) ("consumers injured by insurance practices proscribed under Chapter 176D may sue under Chapter 93A"); M.G.L. c. 93A, §9(1). A plaintiff alleging a violation of c. 176D must comply with the procedural requirements of c. 93A. *See Yood v. Dadasis*, No. 941455, 1995 WL 1146838, at *2 (Mass. Super. Sept. 22, 1995). A defendant responding to such a claim is entitled to the procedural

---

[1]    When a plaintiff sends multiple c. 93A demands, a defendant can respond to any one of them. *See Caira v. Zurich American Ins. Co.*, 91 Mass. App. Ct. 374, 375-77 (2017). AmGUARD could rely on its response to either of the demand letters as a basis for why they are entitled to the protection of the safe harbor provision of c. 93A, § 9. AmGUARD will rely on the first of the demand letters as the demand letters are nearly identical and AmGUARD's first response letter addresses all of the Plaintiff's arguments (whereas the second response letter incorporates these prior arguments.).

protections of c. 93A. *See Calandro v. Sedgwick Claims Mgmt. Servs.*, 264 F. Supp. 3d 321, 323 (D. Mass. 2017). The most important of these protections is the right to be free from c. 93A damages by making a reasonable settlement offer in response to a demand letter. *See Chiulli v. Liberty Mut. Ins., Inc.*, 97 Mass. App. Ct. 248, 253, 146 N.E.3d 471, 478 (2020) ("This defense limits the damages, attorney's fees, and costs that a plaintiff would otherwise be entitled to recover for a violation of c. 93A if the plaintiff rejects a reasonable written offer of settlement made within thirty days of service of a c. 93A demand letter.").

###### A.    The Demand Letter Requirement

The Plaintiff is a consumer so any claim she may have is under §9 of c. 93A. Under c. 93A, §9(1), a person "who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two . . . may bring an action . . . for damages." *Id*. However, §9(1) does not allow a plaintiff to bring an action for injuries other than those caused by the alleged unfair act. *See DiMarzo v. Am. Mut. Ins. Co.*, 389 Mass. 85, 101 (1983) ("Under c. 93A, the plaintiff is entitled to recover for all losses which were the foreseeable consequences of the defendant's unfair or deceptive act or practice."). Accordingly, where the c. 93A claim is based on an alleged violation of c. 176D, a personal injury plaintiff's c. 93A injury is not the personal injury itself, nor is it a judgment in an underlying tort case but rather, it is the loss of use of money. *See Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 469 Mass. 813, 829, 17 N.E.3d 1066, 1081 n.16 (2014) ("the actual damages attributable to the insurer's conduct generally constitute loss of use damages.").

Further c. 93A, §9(3) requires a plaintiff to send a demand letter to the defendant "reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered...thirty days before suit." *Id*. The term "injury suffered" in §9(3) refers back to the injury

referenced in §9(1). In the context of a c. 93A claim based on an alleged violation of c. 176D, the law is clear that the "injury suffered" – the so-called "base damages" – is "the interest lost on the money wrongfully withheld by the insurer, compensating claimants for 'the cost and expense directly resulting from the insurer's conduct.'" *Clegg v. Butler*, 424 Mass. 413, 425, 676 N.E.2d 1134, 1142 (1987).

### B.    The Safe Harbor of G.L. c. 93A, §9

M.G.L. c. 93A, §9(3) provides, in relevant part, that:

> Any person receiving such a [c. 93A] demand for relief who, within thirty days of the mailing or delivery of the demand for relief, ***makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner.***

(Emphasis supplied with bolding and italics). Thus, in other words, a defendant in receipt of a c. 93A demand letter can tender an offer of settlement to the plaintiff and, if the plaintiff rejects a reasonable offer, the defendant can limit the potential damages to the amount of the reasonable settlement offer. "Determination of the reasonableness of the offer of settlement is a question of fact 'which must be determined in light of all the attendant facts and circumstances.'" *Applied Image Reprographics, Inc.*, 2012 WL 2913528, at *12 *quoting Whelin v. Markowski*, 37 Mass. App. Ct. 209, 215 (1994). However, the question of reasonableness of such a settlement offer may be resolved as a matter of law where the plaintiff has no reasonable expectation of proving an essential element of their case. *Wahlstrom v. Zurich American Insurance Company*, 2022 WL 20416910, at *4 (D. Mass. Nov. 22, 2022) *quoting Bobick v. U.S. Fid. & Guar. Co.*, 790 N.E.2d 653, 658-59 (Mass. 2003) ("Although a determination of reasonableness is normally a question of fact for the fact finder, 'when undisputed material facts in the record demonstrate that the plaintiff

6

has 'no reasonable expectation of proving an essential element' of his case,' a question on the reasonableness of a settlement offer may be resolved as a matter of law prior to trial."). That is precisely the situation here, given that no more reasonable or generous offer could have been made here by AmGUARD, per the facts here, including the specific policy limits, timeline of events, and maximum calculation of interest it offered to the Plaintiff. "The party asserting the protection of the statutory limitation on damages has the burden of proving the reasonableness of the settlement offered." *Wahlstrom v. Zurich American Insurance Company*, 2022 WL 20416910, at *4 (D. Mass. Nov. 22, 2022).

> With regard to the "injury actually suffered", Massachusetts courts have held that:

>> '[t[he injury actually suffered' in unfair claim settlement practice cases ordinally includes damages for loss of use of the money wrongfully held. 'The reasonableness of the…offer must be judged in relation to 'the interest lost on the money wrongfully withheld by the insurer, compensating claimants for the costs and expenses directly resulting from the insurer's conduct.'"

*Wahlstrom*, 2022 WL 20416910, at *4 *quoting Calandro v. Sedgwick Claims Mgmt. Servs.*, 264 F. Supp.3d 321, 324 (D. Mass. 2017). In other words, "[t]he money wrongfully withheld is the 'money that [allegedly] should have been, but was not, offered' by the insurer to the plaintiff." *Id. quoting Hopkins v. Liberty Mut. Ins. Co.*, 750 N.E.2d 943, 952 (Mass. 2001). It must also be noted that attorney's fees are not considered part of the "injury actually suffered" by the plaintiff in determining the reasonableness of a settlement. *See id.* With this background in mind, an evaluation of AmGUARD's offer of settlement shows that it was reasonable as a matter of law under the facts and circumstances as it provides a generous interest rate for the purported loss of use of the $1 million policy period from the date the Underlying Action was filed.

**II.    AmGUARD's Offer Was Timely And Reasonable In Relation To The Injury Actually Suffered**

Under G.L. c. 93A, §9(3) and the relevant case law, AmGUARD's liability (if any) to the Plaintiff is limited to the amount of their offer if the offer was timely and if it was reasonable in relation to the "injury actually suffered."  AmGUARD's offer met both requirements.

**A.    The Offer Was Timely**

The Plaintiff's c. 93A demand was dated August 13, 2024. AmGUARD made its offer in a letter dated September 12, 2024. The settlement offer was within the thirty-day period required by M.G.L. c. 93A, §9(3). *See Forcucci v. U.S. Fid. & Guar. Co.*, 11 F.3d 1, 2 (1st Cir. 1993) ("Thirty days is a statutory period relating to a defendant's opportunity to receive Ch. 93A protection [pursuant to] Mass.G.L. c. 93A, § 9(3)").

**B.    The Offer Was Reasonable In Relation To The "Injury Actually Suffered"**

In response to the Plaintiff's demand letter, AmGUARD offered $232,769.16. This amount represents interest at the rate of 12% on the $1 million limit of liability on the AmGUARD policy issued to the Arrudas based on the assumption that the $1 million was payable on September 1, 2022 (the date the Underlying Action was filed). This is in addition to the $1 million limit of liability that was paid to the Plaintiff on August 8, 2024.

Again, the "standard for examining the adequacy of an insurer's response to a demand letter for relief under G.L. c. 93A, §9(3) is 'whether, in the circumstances, and in light of the complainant's demands, the offer is reasonable.'" *Clegg*, 424 Mass. at 420. "Although a determination of reasonableness is normally a question of fact for the fact finder, 'when undisputed material facts in the record demonstrate that the plaintiff has 'no reasonable expectation of proving an essential element' of his case,' a question on the reasonableness of a settlement offer may be

resolved as a matter of law prior to trial." *Wahlstrom*, 2022 WL 20416910, at *4 (D. Mass. Nov. 22, 2022).

Here, the "injury actually suffered" by the Plaintiff because of the alleged c. 93A violation was that she did not have use of the $1 million for a period of time. As noted above, the Plaintiff demanded the $1 million limit of liability on November 7, 2022. Even assuming *arguendo* that liability was reasonably clear on November 7, 2022 (which AmGUARD disputes), AmGUARD's offer of $232,769.16 more than compensates the Plaintiff for the purported "injury actually suffered" as it provides interest for the loss of use for an even longer period of time – from when the Complaint in the Underlying Action was first filed until the date the Plaintiff received the $1 million policy limit.

For this Court to analyze if AmGUARD's offer was reasonable as a matter of law under the c. 93A/176D framework, it considers three aspects of the record before it: (1) the amount that the insurer allegedly should have been paid; (2) the date the money should have been paid; and (3) the appropriate interest rate to apply. Starting with the last of these points, AmGUARD's September 12, 2024 offer provided for an interest rate of 12%, which is the prejudgment interest rate in Massachusetts, and thus the high-water mark for any fair or reasonable interest rate for legal matters as a matter of law. *See* M.G.L. c. 231, §6B. It is well-settled that c. 93A does not require a 12% interest rate but rather "[t]he loss of use calculus requires only the use of a 'fair rate' of interest, rather than any particular interest rate." *Wahlstrom*, 2022 WL 24016910, at *7 (holding 3.39% "was a reasonable interest rate as a matter of law at that time."). Indeed, plaintiffs in prior cases have even attempted to argue that 12% should be the interest rate applied to the loss of use calculus, but the Courts have found lesser rates to be a "fair rate." *See Rivera v. Com. Ins. Co.*, 84 Mass. App. Ct. 146, 150 (2013) ("The plaintiffs also claim they are entitled to twelve percent

interest. The plaintiffs were entitled to a 'fair rate" of interest on the amount wrongfully withheld by Commerce."). Further, the Court in *Wahlstrom* referenced the judgment rate as a basis for determining a "fair rate" of interest. *See Wahlstrom*, 2022 WL 20416910, at \*7 (D. Mass. Nov. 22, 2022) ("During the relevant period, this Court's judgment rate between August 2015 and November 2019 never exceeded 2.73% and was at times as low as 0.23%."). From September 1, 2022 (the date the Underlying Action was filed) to August 8, 2024 (the date the check was received by the Plaintiff's counsel), this Court's judgment rate ranged to 3.33% to 4.65%. *See* https://www.mad.uscourts.gov/finance/fees.htm (last visited on April 2, 2025). As such, for these reasons, 12% is a reasonable interest rate as a matter of law.

Additionally, AmGUARD's safe harbor offer for "loss of use" was calculated based on the most expansive and generous date range (the date of Plaintiff's filing until the date she received the policy limit) and this provides further support that the offer was reasonable as a matter of law. For complete clarity on this point as to how AmGUARD arrived at its offer, notwithstanding its position that liability was not reasonably clear, it considered the following. The Plaintiff demanded the $1 million limit of liability on November 7, 2022. AmGUARD chose to make an offer of interest backdated to September 1, 2022, the date the Underlying Action was filed. This is a favorable assumption to the Plaintiff as it is the earliest possible date on this record the Underlying Action could have settled. AmGUARD also made its offer based on the correct amount to be paid – the limit of liability of the policy it issued to the Arrudas.

It is anticipated that the Plaintiff will assert that the offer should have been based on the total amount set forth in the "consent judgment." However, this assertion would contravene Massachusetts decisional law. More specifically, the SJC, in determining whether a settlement/assignment agreement (like the "consent judgment" here) is reasonable, held that:

> [b]ecause the consequence of a settlement/assignment agreement is
> that the plaintiff may collect damages only from the insurer, having
> released the insured defendants from personal liability, ***a reasonable
> settlement amount may not exceed the limits of the insured's
> potential insurance coverage, because the plaintiff may recover in
> damages no more than that from the insurer***.

*Com. Ins. Co. v. Szafarowicz*, 483 Mass. 247, 266 (2019) (Emphasis supplied with bolding and italics) *citing Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 644-45 & n.6 (Iowa 2000) (holding that insurer has "no obligation" to pay settlement amount "in excess of its [policy] limits"). In *Szafarowicz*, the SJC concluded that "[w]here the amount of the judgment arising from the settlement/assignment agreements was greater than $500,000, the limits of the insured's combined mandatory and optional bodily injury coverage, we conclude that the amount obtained through the settlement is per se unreasonable." *Id.* at 267. Accordingly, the most that the Plaintiff was entitled to receive from AmGUARD for the Underlying Action was the full policy limit of $1 million which AmGUARD paid her on August 8, 2024 and on which AmGUARD used to calculate its settlement offer.

It is also anticipated that the Plaintiff will argue, much like what was alleged in her Complaint, that AmGUARD offered "to pay the judicial interest owed on the Judgment" such that AmGUARD's offer does not constitute a safe harbor offer. This argument, if made, is belied by both the facts and the law. For starters, AmGUARD's response letter of September 12, 2024 explains that the offer was based on the loss of use calculus and explained how AmGUARD arrived at this amount. What's more, under the terms of the "consent judgment", AmGUARD does not owe prejudgment interest. As explained in AmGUARD's response letter, "[a] consent judgment...is akin to a private contract, one that it is simply acknowledged and recorded by a court." *Cawthorn v. Auto-Owners Ins. Co.*, 791 F. App'x 60, 65 (11th Cir. 2019). Further, the Massachusetts Appeals Court ruled that a plaintiff was not entitled to prejudgment interest on the

value of an agreement for judgment. In *Penniman Hill Farm, Inc. v. Costa*, 2016 WL 342311 (Mass. App. Ct. Jan. 28. 2016), the Appeals Court affirmed the lower court's ruling and held as follows:

> The judge ordered that interest was not available on settlement damages. [Plaintiff] attempts to distinguish the agreement for judgment as something other than a settlement for the purposes of calculating prejudgment interest. This argument fails because the parties are bound by the agreement for judgment, which does not stipulate that the [defendant] must pay interest on the award. The parties were free to agree to an interest award but elected not to do so, and we presume that the agreement for judgment contemplated all damages associated with the corresponding claims.

*Id.* at *4. In the present matter, the consent judgment drafted by, and agreed to between counsel (not drafted by the court) provides that:

> IT IS ORDERED, ADJUDGED AND DECREED that a judgment of liability is hereby entered against Manuel Arruda and Madalena Arruda in favor of Victoria Gretzky in the amount of $2,250,000.00, exclusive of interests and costs[.]

There is no language here awarding prejudgment interest to the Plaintiff. Thus, where the consent judgment does not stipulate (and specifically leaves out) prejudgment interest, AmGUARD did not owe this, and the settlement offer is based on an entirely different calculus – alleged loss of use of the policy limit. The Plaintiff may assert that the provision providing that "Victoria Gretzky releases Manuel Arruda and Madalena Arruda from any personal liability beyond the limits of Policy No. MABP159913 plus legal interest and agrees to take no action to collect a judgment against their assets in excess of any available liability insurance coverage" supports the awarding of prejudgment interest. However, the vague reference to "legal interest" does not stipulate a specific prejudgment interest award, nor does it state that AmGuard is to pay it. Accordingly, the Plaintiff's attempted characterization of the settlement offer as prejudgment interest falls flat as it

was not owed under the terms of the consent judgment and the amount offered by AmGUARD

was based on a loss of use calculus that is reasonable under the circumstances as a matter of law.

## CONCLUSION

For the reasons set forth herein, AmGUARD's c. 93A offer was reasonable as a matter of

law. AmGUARD is therefore entitled to the benefit of the "safe harbor" provision of M.G.L. c.

93A, §9 limiting its damages to $232,769.16.

 The Defendant,

AMGUARD INSURANCE COMPANY,

By its attorneys,

*/s/ Lincoln A. Rose*
Tamara Smith Holtslag, BBO#634027
Lincoln A. Rose, BBO#691797
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
(617) 951-2011
tsmith@peabodyarnold.com
lrose@peabodyarnold.com

Dated: May 21, 2025

## CERTIFICATE OF SERVICE

I, Lincoln A. Rose, hereby certify that I have, on May 21, 2025, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF). Participants in this case not registered on the ECF system, if any, will receive service through regular first-class mail.

*/s/ Lincoln A. Rose*
Lincoln A. Rose

# EXHIBIT A



**Bottaro**
LAW FIRM LLC

756 Eddy Street
Providence, RI 02903
Phone 401.777.7777 | Fax. 401.383.5005
www.BottaroLaw.com

August 13, 2024

**_Via Certified Mail and Email:_**
Tamara Smith Holtstag
Lincoln Rose
Peabody & Arnold, LLP
600 Atlantic Avenue
Boston, MA 02210
tsmith@peabodyarnold.com
lrose@peabodyarnold.com

**_Via Counsel:_**
Steven Dyki
Berkshire Hathaway Guard
Empire State Building
350 5ᵗʰ Avenue, Suite 4520
New York, NY 10118
Steven.Dyki@GUARD.com

RE:    _Victoria Gretzky v. Manuel Arruda, et al_
Bristol County, MA Superior Court; Civil Action No. 2273CV00595

Dear Counsel:

This demand letter is sent on behalf of Victoria Gretzky and in compliance with M.G.L. c. 93A § 9(3). On July 8, 2024, you indicated that your firm represented AmGuard Insurance Company "relative to [the Gretzky action]." In consideration of Rule 4.2 of the Massachusetts Rules of Professional Conduct, Ms. Gretzky is sending this correspondence to your firm instead of communicating this demand directly to known AmGuard representatives. If you do not represent AmGuard for any derivative claims arising from the Gretzky action, please notify me immediately so that this demand can be served upon the correct person.

In support of her demand, please consider the following timeline of events:

- September 26, 2021 – Victoria Gretzky suffers significant injuries to her lower extremities after a fall that occurred at the apartment building owned by Manuel and Madalena Arruda, Defendants in the underlying action.

- September 29, 2022 – Attorney Sorbello sent a letter to Attorneys Wallen and O'Connor entitled "M.G.L. c. 93A and 176D NOTICE" via email. This letter informed counsel that Ms. Gretzky had incurred over $250,000 in medical expenses and demanded payment for her pain and suffering. The letter further outlined the Defendants' insurance company's unfair claims settlement practices in violation of M.G.L. c. 93A and 176D, specifically § 3(9)(b), (c), (e), and (n).

- October 11, 2022 – Attorney Sorbello's office sent Ms. Gretzky's medical records and bills to Attorney Wallen via e-mail.

- November 7, 2022 – Attorney Wallen sent the AmGuard policy to Attorney Sorbello, disclosing the $1,000,000 policy limits for the first time.

1

- On November 21, 2022 – Attorney Sorbello sent a letter to Attorneys Wallen and O'Connor making demand for the $1,000,000 policy limits. This demand outlined the Arrudas' breach of the warranty of habitability and various building code violations. The demand also included the specific injuries and treatment Ms. Gretzky had endured because of the accident.

- January 27, 2023 – Attorney Sorbello sent Plaintiff's Motion to Amend Complaint to AmGuard via certified mail. The proposed Amended Complaint outlined the facts of the accident, Ms. Gretzky's injuries, and the Arrudas' negligence, including their clear breach of the warranty of habitability. The proposed amendment also outlined AmGuard's unfair claims settlement practices in violation of M.G.L. c. 93A and 176D, specifically § 3(9)(d), (f), and (n).

- February 6, 2023 – AmGuard received the proposed Amended Complaint.

- March 3, 2023 – Attorney Sorbello sent an updated Plaintiff's Motion to Amend Complaint to AmGuard. The updated version contained the same allegations regarding the facts of the accident, Ms. Gretzky's injuries, and AmGuard's statutory violations. The motion was ultimately not presented to the Court.

- October 31, 2023 – Attorney Sorbello sent an e-mail to Attorneys O'Connor and Telese forwarding the report prepared by Todd Thomas, Plaintiff's building code and life safety rules expert. Mr. Thomas outlined several building code violations regarding the subject stairway.

- December 15, 2023 – The parties submitted their Joint Pretrial Memorandum to the Court, which outlined Plaintiff's two additional experts, Dr. Walter Panis and Cheryl Kaufman. These experts' reports were delivered to Attorneys O'Connor and Telese prior to the submission of the memorandum. The reports outlined Ms. Gretzky's future treatment needs and costs to be incurred because of the accident, which totaled approximately $750,000.

- February 29, 2024 – Attorneys O'Connor and Telese convey AmGuard's first offer to settle for $60,000.

- March 25, 2024 – Attorney Sorbello sent a letter to Attorney O'Connor making demand for the $1,000,000 policy limits. This demand outlined the Arrudas' breach of the warranty of habitability and various building code violations. The demand also included a recitation of Ms. Gretzky's specific injuries, total bills for treatment incurred to-date, and future treatment costs.

- March 27, 2024 – Attorney O'Connor sent an e-mail to Attorney Sorbello indicating he "was in touch with the carrier [AmGuard] today…The carrier's rep would like us to focus on [mediation] or [trial] in the next couple of weeks."

- April 8, 2024 – Attorney Sorbello sent an e-mail to Attorney O'Connor declining mediation and re-urging Ms. Gretzky's prior demands.

- April 22, 2024 – Attorney O'Connor sent Attorney Sorbello an e-mail advising he had "been given $100K in authority by AmGuard to rekindle [settlement] discussions. Am led to belief [sic] this is not the last offer it will make. My impression is that a counter will trigger another offer."

- May 2, 2024 – Attorney O'Conner sent Attorney Sorbello an e-mail advising "[AmGuard] has given me the ok to offer $200K in an effort to elicit a counter. Am informed there is substantial room to move."

- May 9, 2024 – Prior to the final pre-trial conference, Attorney O'Connor called Attorney Sorbello and extended a $700,000 settlement offer. He further indicated he was "trying to get the million" from AmGuard.

- May 10, 2024 – AmGuard's Vice President of Litigation, Steven Dyki, sent Attorney Savoie a letter indicating his belief that the matter had settled for $1,000,000 the previous day, and he had "instructed counsel [O'Connor] to take appropriate action to enforce the agreed-upon settlement." As instructed by AmGuard, O'Connor filed a motion to enforce the alleged settlement, which the Court denied a few hours later. Attorney Dyki also indicated that AmGuard would only pay prejudgment interest awarded against the insured on the part of the judgment AmGuard pays, pursuant to the policy language.

- May 14, 2024 – Ms. Gretzky and the Arrudas agreed to a consent judgment in the amount of $2,250,000, expressly reserving Ms. Gretzky's rights to pursue both first- and third-party bad faith claims against AmGuard.

- June 26, 2024 – Judgment was entered by the Court.

- July 8, 2024 – Ms. Gretzky requested payment of the judgment plus legal interest from AmGuard.

- July 12, 2024 – AmGuard's counsel sent a letter to Attorney Savoie advising a check in the amount of $1,000,000 would be delivered to Attorney Bottaro's office.

- July 15, 2024 – Attoreny Bottaro received a check from AmGuard in the amount of $1,000,000. The check stub includes a notation that it was written in "full and final settlement" and "note: per settlement in court."

- July 16, 2024 – Attorney Savoie sent a letter to AmGuard's counsel advising the check as written would constitute accord and satisfaction of all claims if negotiated, effectively foreclosing Ms. Gretzky's reserved rights to pursue and bad faith claims. Plaintiff requested a new check that included the policy limits and legal interest without such notations.

- July 19, 2024 – AmGuard's counsel refused to reissue the check in the correct amount and without notations. AmGuard's counsel offered to reissue a check for $1,000,000 if and only if Ms. Gretzky or her counsel would agree to certain settlement language.

- July 29, 2024 – AmGuard's counsel, in response to Ms. Gretzky's counsel return of the check with settlement notations, promised to reissue a check for the full policy limits without the prior notation.

- July 31, 2024 – Undersigned counsel received a reissued check for $1,000,000. The check stub again included a notation that was written in "full and final settlement" despite AmGuard's assurances such language would be removed. The check was returned to AmGuard.

- August 8, 2024 – AmGuard sent a check for $1,000,000 without any settlement notations. The check does not include any amount payable for judicial interest.

## AMGUARD'S 93A AND 176D VIOLATIONS

M.G.L. c. 93A governs the regulation of business practices for consumer protection. Chapter 93A authorizes any Massachusetts consumer to bring an action against an insurance company for unfair or deceptive practices as provided in M.G.L. c. 176D. Here, AmGuard has committed the following violations of Chapter 176D § 9:

- **(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue** – AmGuard's Vice President of Litigation advised Ms. Gretzky's counsel, in writing, that "…AmGUARD notes that in the event of a judgment against our insured, AmGUARD will pay prejudgment interest awarded against the insured on the part of the judgment we pay, pursuant to our policy language."

  AmGuard told Ms. Gretzky that its policy would pay prejudgment interest on any judgment entered its insureds. Here, judgment was entered on June 26, 2024. AmGuard's counsel now takes the position that AmGuard will not pay any legal interest on its portion of the judgment. This new position misrepresented AmGuard's policy provisions, and thus, constitutes bad faith.

- **(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies** – For months, Ms. Gretzky's counsel repeatedly made demand upon AmGuard through the Arrudas' assigned counsel for payment of the insurance policy limits. Ms. Gretzky's counsel provided supporting medical records, bills, and expert reports over the course of 18 months. Despite this satisfactory proof of loss, AmGuard never made a good faith offer to settle until the eve of trial. When the policy limit was eventually offered, AmGuard did so without receiving any additional material evidence regarding the claim's value in the five months prior thereto.

4

- **(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies** – AmGuard failed to conduct a prompt investigation of Ms. Gretzky's claim based on the above-referenced timeline.

- **(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information** – AmGuard failed to timely pay Ms. Gretzky's claim after receiving a satisfactory proof of loss based on the above-referenced timeline.
- **(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear** – Ms. Gretzky's counsel outlined the various building code violation and warranty of habitability breaches to the Arrudas' assigned counsel just one day after the Arrudas appeared and filed their Answer. Ms. Gretzky's counsel continued to outline this clear theory of liability in follow-up letters and the amended complaint that was served on AmGuard in early 2023. Further, the delivery of Plaintiff's expert report on October 31, 2023, made liability crystal clear. Neither the Arrudas nor AmGuard ever retained an expert to dispute these opinions. Despite this clear liability, AmGuard waited several months before even making its first low-ball offer.

- **(n) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement** – Neither AmGuard nor its assigned counsel for the Arrudas provided Ms. Gretzky with a reasonable (or any) explanation as to why her claim was being ignored for months.

### POST-JUDGMENT UNFAIR OR DECEPTIVE INSURANCE PRACTICES

AmGuard's post-judgment practices are perhaps even more egregious than its pre-judgment failures. After judgment was entered against the Arrudas, AmGuard did not promptly pay the portion of the judgment it owed -- $1,000,000 plus legal interest. Undersigned counsel reached out to Attorney Dyki regarding payment and provided a deadline of July 12, 2024, for AmGuard to satisfy its portion of the judgment.

On the day of the deadline, AmGuard's new counsel sent a letter to Attorney Savoie indicating that a check in the amount of $1,000,000 was scheduled for delivery to Attorney Bottaro's office the following week. AmGuard's new counsel provided several written excuses as to why AmGuard would not pay any interest on the judgment against its insureds.

On July 15, 2024, Attorney Bottaro received AmGuard's check in the amount of $1,000,000. AmGuard's chose to write on the attached stub that the check was written in "full and final settlement" and "note: per settlement in court." If Ms. Gretzky were to negotiate the check as written by AmGuard, she would have effectively waived her rights to pursue the first- and third-party bad faith claims as specifically reserved in the judgment.

The very next day, Ms. Gretzky alerted AmGuard to these concerns. Instead of paying its portion of the judgment with legal interest and without conditions, AmGuard's counsel advised that Ms. Gretzky could only receive AmGuard's check if her counsel sign additional terms outlined in her July 19, 2024, letter. Eventually, AmGuard agreed to provide a check without reference to any settlement, only to reissue a second check with another settlement notation.

5

First, AmGuard tried to trick Ms. Gretzky into signing a check that would foreclose her rights to recover in the future against AmGuard. Then, AmGuard decided to hold Ms. Gretzky's money hostage until she agreed to AmGuard's precise terms. When AmGuard relented from its position, it reissued another check with a settlement notation. Regardless, AmGuard refused to honor the words of its policy and position asserted by its own Vice President of Litigation by vowing to never pay legal interest. AmGuard's decisions have caused and will continue to cause Ms. Gretzky harm.

## VICTORIA GRETZKY'S DEMAND

AmGuard has intentionally, knowingly, willfully, and repeatedly violated Masschusetts laws against unfair and deceptive practices in the business of insurance. As such, Ms. Gretzky hereby demands payment of the judgment, legal interest, and statutory penalties provided in M.G.L. c. 93A and 176D, specifically:

- Payment of prejudgment interest on the part of the judgment owed by AmGuard;
- Payment of three times the total judgment against its insureds, $6,750,000.00, for AmGuard's willful and knowing statutory violations;
- Payment of attorneys' fees in the amount of $1,500,000.

Pursuant to Chapter 93A § 9(3), this demand will remain open for 30 days. If the demand is not accepted by Thursday, September 12, 2024, at 5:00 p.m. eastern time, then it will be deemed withdrawn, and Ms. Gretzky will file a formal action against AmGuard for recovery of these payments and penalties.

## AMGUARD HAS NO REASONABLE EXCUSE FOR ITS FAILURES AND DECISIONS

Ms. Gretzky anticipates AmGuard will attempt to defend its failures by pretending it did not receive sufficient notice of Ms. Gretzky's claim, and thus, it could not properly evaluate its merits for settlement purposes. This is demonstrably false.

At a minimum, AmGuard received Plaintiff's proposed amended complaint via certified mail on February 6, 2023. The amended complaint set forth Ms. Gretzky's undisputed theories of liability and attendant damages.

Further, the communications to Attorney O'Connor and his co-counsel are imputed to AmGuard. While Attorney O'Connor appeared in the underlying suit on behalf of the Arrudas, he was presumably assigned and paid by AmGuard. Indeed, the first footnote in Defendants' post-judgment filing confirmed "[t]he Arrudas' insurer engaged David M. O'Connor to defend and try the case." Throughout the litigation, Attorney O'Connor indicated, in writing, that he "was in touch with the carrier;" that "[AmGuard's] rep woud like us to focus on [mediation] or [trial];" that he had "been given $100K in authority by AmGuard to rekindle [settlement] discussions;" and that he had been "given the ok to offer $200K" by AmGuard. Even Vice President of Litigation Dyki described his "instruction" to Attorney O'Connor to file motions on AmGuard's behalf to enforce a settlement that never was.

6

On paper, Attorney O'Connor was the Arrudas' counsel. In reality, Attorney O'Connor was AmGuard's agent. Any communications to him or his partners and associates will be imputed to AmGuard, and Ms. Gretzky is confident that formal discovery will fully reveal how involved AmGuard was or should have been in the adjustment of this case.

Beyond that putrid defense, AmGuard has no justifiable excuse for its failures and unscrupulous decisions.

## NOTICE TO PRESERVE AND NOT DESTROY ANY DOCUMENTARY EVIDENCE

In the event AmGuard does not timely meet Ms. Gretzky's demand, please be advised that Ms. Gretzky intends to file suit against AmGuard for payment of the judgment, legal interest, costs, attorneys' fees, and penalties pursuant to M.G.L. c. 93A and 176D. You are hereby notified to preserve any written documents, e-mails, text messages, video messages, adjustment notes, photographs, records, bills, or other communications sent or received by AmGuard's agents, employees, subsidiaries, or counsel regarding the claims made by Victoria Gretzky. Any destruction or failure to preserve these materials will be considered spoliation of material evidence.

Sincerely,

Gregory P. Sorbello, Esq.
Attorney at Law

7

# EXHIBIT B

**PEABODY & ARNOLD**

Celebrating 125 Years
1899 - 2024

Tamara Smith Holtslag
(617) 951-2012
tsmith@peabodyarnold.com

Lincoln A. Rose
(617) 951-2069
lrose@peabodyarnold.com

September 12, 2024

**Via Email Only: Greg@bottarolaw.com**

Gregory P. Sorbello, Esq.
Bottaro Law Firm LLC
756 Eddy Street
Providence, RI 02903

| Re: | **Insured:** | Manuel & Madalena Arruda |
|---|---|---|
| | **Policy No.:** | MABP254155 |
| | **Matter:** | Victoria Gretzky v. Manuel Arruda, et al., Civil Action No. 2273CV00595, Bristol County Superior Court (the "Gretzky Action") |
| | **Claim No.:** | MABP254155-001-001-001 |

Dear Attorney Sorbello:

This office represents AmGuard Insurance Company ("AmGuard") in connection with the above-referenced matter. This responds to your letter of August 13, 2024 which purports to be a demand letter pursuant to M.G.L. c. 93A and c. 176D. Nothing herein is an admission of liability or that your letter complies with the requirements of M.G.L. c. 93A. AmGuard reserves the right to raise any and all defenses to your client's claim, whether or not specifically set forth herein. AmGuard denies that it violated M.G.L. c. 93A or c. 176D, or any other law, with respect to the handling and settlement negotiations of your client's claim against AmGuard's insureds, Manuel and Madalena Arruda. AmGuard was never under any obligation to settle your client's claim for the simple reason that the respective liability of the parties was never reasonably clear.

As is bedrock insurance law in Massachusetts, "[a]n insurer's duty to settle arises when 'liability has become reasonably clear.'" O'Leary-Allison v. Metropolitan Property & Cas. Ins. Co., 52 Mass. App. Ct. 214, 217 (2001) quoting M.G.L. c. 176D, §3(9)(f). In this context, liability encompasses both fault and damages. Clegg v. Butler, 424 Mass. 413, 421 (1997). The objective test used to determine whether an insured's liability has become reasonably clear asks "whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff." Demeo v. State Farm Mut. Auto Ins. Co., 38 Mass. App. Ct. 955, 956-58 (1995) (liability not reasonably clear where probability that insured is liable is equal to probability that insured is not liable.). The insurer need only have a "reasonable belief" that liability

PEABODY
&ARNOLD

Gregory P. Sorbello, Esq.
September 12, 2024
Page 2

is not clear to insulate itself from liability under M.G.L. c. 176D, §3(9)(f) for electing not to effectuate a settlement. See Bolden v. O'Connor Café of Worcester, Inc., 50 Mass. App. Ct. 56, 67 (2000). "So long as the insurer acts in good faith, the insurer is held not to the standards of omniscience or perfection; it has leeway to use, and should consistently employ, its honest business judgement." Bolden, 50 Mass. App. Ct. at 67 citing Peckham v. Continental Cas. Ins. Co., 895 F.2d 830, 835 (1st Cir. 1990).

AmGuard denies your repeated and meritless allegations that liability, both in terms of fault and damages, was reasonably clear. While your letter purports to give a recitation of the history of the Gretzky Action, it fails to acknowledge that the Arruda's defense counsel[1] challenged both fault and damages and intended to introduce evidence disputing both aspects. More specifically, the Joint Pretrial Memorandum the parties submitted in the Arruda Action states in relevant part:

> [t]he defendants challenge liability and damages and expect the evidence to showing the following:
>
> The plaintiff has alleged that the stairwell railing came dislodged from the wall, causing her to fall down the stairs. There is no evidence that the railing was loose or dislodged prior to the fall or that the defendants knew or had reason to know that the railing was loose. The plaintiff walked down the stairs without issue and did not notice that the railing was loose or dislodged and did not notify the defendants of the same. The defendants were not negligent in their maintenance and care of the stairwell.
>
> The plaintiff's claimed injuries were casually related to her own negligence. The plaintiff was not a tenant of the defendants, but was instead staying with her daughter, a tenant. The plaintiff had fallen previously and had pre-existing mobility issues. As a result of her prior injuries, she was not steady on her feet when she walked. The defendants also challenge that her identified future life care needs and mobility restrictions are causally related to the fall rather than a function of her preexisting medical conditions and age.

---

[1]    Your letter engages in unbridled speculation that "[o]n paper, Attorney O'Connor was the Arrudas' counsel. In reality, Attorney O'Connor was AmGuard's agent. Any communications to him or his partners and associates will be imputed to AmGuard, and Ms. Gretzky is confident that formal discovery will fully reveal how involved AmGuard was or should have been in the adjustment of this case." This assertion has no basis in the facts or the law and shows a profound misunderstanding of the tripartite relationship between an insured, appointed defense counsel and the insurer. Indeed, the SJC has held that "a lawyer hired by an insurer to represent an insured owes an unqualified duty of loyalty to the insured and must act at all times to protect the insured's interests." Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 408 (2003). As such, "[s]ince the conduct of the litigation is the responsibility of trial counsel, the insurer is not vicariously liable for the...attorneys who conduct the defense of the insured." Id. (internal citations and quotations omitted). Accordingly, where Attorney O'Connor had an "unqualified duty of loyalty" to the Arrudas, he is not an agent of AmGuard and communications to him cannot be imputed to AmGuard and/or form the basis for liability under c. 93A/176D.

PEABODY
&ARNOLD

Gregory P. Sorbello, Esq.
September 12, 2024
Page 3

As noted above "if damages are contested in good faith, then liability on the claim is not reasonably clear." Ingalls v. Minnesota Laws. Mut. Ins. Co., 2013 WL 3943537, at *1 (D. Mass. July 29, 2013). "This is especially true in cases involving comparative negligence. In such circumstances, even if fault has been determined, if the percentage of potential damages attributable to the defendant is the subject of a good faith disagreement, then liability is not clear." Id. ("reasonable uncertainty as to either the total amount of damages or the defendant's comparative share may prevent liability from being reasonably clear."). Such is the case here as set forth in the Joint Pretrial Memorandum where the defendants both disputed liability in addition to the amount of alleged damages, the causation of the alleged damages and the comparative fault. Whether the jury would have agreed with the defendants is immaterial as a "plausible, reasoned legal position that may ultimately turn out to be mistaken—or simply, as here, unsuccessful—is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D." Guity v. Com. Ins. Co., 36 Mass. App. Ct. 339, 343, 631 N.E.2d 75, 77 (1994). Though you clearly disagree with the Arrudas' defense in this matter, the insured set forth plausible, legitimate defenses to your client's claims, and therefore, liability (as that term is used in c. 176D) was never reasonably clear.

Furthermore, contrary to your letter's assertions that AmGuard failed to timely make a good faith settlement offer and made an initial "low-ball" offer, the timeline of events your letter purports to describe establishes the reasonableness of AmGuard's conduct in attempting to settle the Gretzky Action. The First Circuit Court of Appeals has held that under M.G.L. c. 176D:

> [n]egotiating a settlement, particularly when the damages are unliquidated, is, to an extent, a legitimate bargaining process. The statute does not call for defendant's final offer, but only one within the scope of reasonableness. Experienced negotiators do not make their final offer first off, and experienced negotiators do not expect it, or take seriously a representation that it is…
>
> The reasonableness of a defendant's response is to be considered in the light of the situation as a whole, one aspect of which was the size of plaintiffs' demand. Plaintiffs' demand was very high.[2] Ordinary give and take would suggest that both would and should move.

Forcucci v. U.S. Fid. & Guar. Co., 11 F.3d 1, 2 (1st Cir. 1993); see also McCarthy v. Safety Ins. Co., 2015 WL 1836618, at *5 (Mass. Super. Mar. 24, 2015) ("All the law requires is that an insurer extend a reasonable offer of settlement—and thereby participate in good faith in the bargaining process— once the matter of liability and damages has become clear to it."); Panzarella v. Travelers Ins. Co., 2002 WL 1290207, at *23 (Mass. Super. Apr. 26, 2002) (holding that insurer did not fail to make prompt and reasonable settlement offer and noting that "[a]s is common in the initial phase of settlement negotiations, the parties' offer and counter-offer represented relatively extreme positions.").

Here, Ms. Gretzky was on the receiving end of multiple good faith settlement offers to resolve the Gretzky Action. Such offers included substantial six figure offers ($100,000; $200,000 and $700,000) in which AmGuard essentially negotiated against itself. See Forcucci, 11 F.3d at 2 ("Ordinary give and take would suggest that both would and should move. Defendant was not ever given that

PEABODY
& ARNOLD

Gregory P. Sorbello, Esq.
September 12, 2024
Page 4

opportunity, even when it traded against itself[.]"). Under these circumstances, your letter's claim essentially boils down to an argument that AmGuard should have offered the policy limit, which Ms. Gretzky eventually accepted, earlier and it violated M.G.L. c. 176D by not doing so. Once again, this claim would fail. Indeed, a Massachusetts court has previously rejected such an argument and held that:

> [p]laintiff contended at trial that Metropolitan's ultimate capitulation and payment of the $100,000 policy limits itself evidences Metropolitan's bad faith in having previously refused to offer that amount. The Court disagrees. Faced with the expense of a trial and the unpredictability of what a jury might award, as well as the prospect it might be sued by the insured if it refused to offer the policy limits and an award exceeding the policy limits ensued, the ultimate payment of those limits was, the Court finds, a reasonable business policy decision, but was not, in the circumstances, an indication that the company believed its prior settlement offer to have been unreasonable.

Shaffer v. Metlife, Inc., 2006 WL 2848105, at *7 (Mass. Super. Sept. 20, 2006). Such is precisely the scenario here as AmGuard, faced with a trial and its corresponding unpredictability, made a good faith business judgment and offered (and paid) its policy limit to Ms. Gretzky which she has since accepted. Moreover, [a]n absence of good faith and the presence of extortionate tactics generally characterize the basis for a c. 93A—176D action based on unfair settlement practice." Guity, 36 Mass. App. Ct. at 344. Your letter is devoid of any alleged extortionary tactics on the basis of AmGuard. Accordingly, there is no violation of M.G.L. c. 93A/176D where AmGuard exercised its honest business judgment and made good faith settlement offers to Ms. Gretzky.

Additionally, AmGuard must also reject your letter's assertions that its "post-judgment practices" also violated M.G.L. c. 93A and/or c. 176D. *First,* it was a negotiated agreement, recorded by the presiding judge to be a settlement, not a "judgment." *Second*, your assertion that the initial check for the policy limit, with notations "full and final settlement" and "note: per settlement in court", "would have effectively waived Ms. Gretzky's rights to pursue the ... bad faith claims" is meritless for the reasons previously stated. Again, the notations on the checks were simply for AmGuards internal accounting purposes and to protect its insureds, and were in no way any attempt by AmGuard to have Ms. Gretzky relinquish any rights and/or claims she may have against AmGuard. *Third*, the cases you previously relied on are inapposite to the present matter as they concerned accord and satisfactions between parties to a contract. See Wong v. Paisner, 14 Mass. App. Ct. 923, 924 (1982). Simply put, AmGuard was not and is not a party in the underlying lawsuit or its resolution. Indeed, in similar circumstances Massachusetts courts have rejected an argument (by an insurer in that instance) that acceptance of insurance proceeds by a claimant was an accord and satisfaction of claims under Chapter 93A and 176D. See Behn v. Legion Ins. Co., 173 F. Supp.2d 105, 111-12 (D. Mass. 2001) (rejecting insurer's argument that accord and satisfaction barred Chapter 93A/176D lawsuit where the agreement for judgment "was not signed by Legion [the insurer], nor was Legion a party to the underlying action" and reasoning that "[a]lthough Legion paid $1,000,000 to the Behns on behalf of Doctor Tufo, that was in its capacity as Doctor Tufo's insurer and was paid to discharge Doctor Tufo's liability in the underlying malpractice case. The accord and satisfaction bars further

PEABODY
&ARNOLD

Gregory P. Sorbello, Esq.
September 12, 2024
Page 5

action against Doctor Tufo relating to his treatment of Adam, but does not bar this suit against Legion for its failure to settle the insurance claim."). Simply put, this is nothing more than an attempt to manufacture a c. 176D claim where none is to be found.[2]

Similarly, your claim that Ms. Gretzky is owed prejudgment interest on its part of the "judgment" is also misplaced. To begin, the case was resolved by a consent judgment. As courts have noted "[a] consent judgment...is akin to a private contract, one that it is simply acknowledged and recorded by a court." Cawthorn v. Auto-Owners Ins. Co., 791 F. App'x 60, 65 (11th Cir. 2019). Indeed, in nearly identical circumstances, the Massachusetts Appeals Court ruled that a plaintiff was not entitled to prejudgment interest on the value of an agreement for judgment. In Penniman Hill Farm, Inc. v. Costa, 2016 WL 342311 (Mass. App. Ct. Jan. 28. 2016), the Appeals Court affirmed the lower court's ruling and held as follows:

> The judge ordered that interest was not available on settlement damages. [Plaintiff] attempts to distinguish the agreement for judgment as something other than a settlement for the purposes of calculating prejudgment interest. This argument fails because the parties are bound by the agreement for judgment, which does not stipulate that the [defendant] must pay interest on the award. The parties were free to agree to an interest award but elected not to do so, and we presume that the agreement for judgment contemplated all damages associated with the corresponding claims.

Id. at *4. In the present matter, the consent judgment provides that:

> IT IS ORDERED, ADJUDGED AND DECREED that a judgment of liability is hereby entered against Manuel Arruda and Madalena Arruda in favor of Victoria Gretzky in the amount of $2,250,000.00, exclusive of interests and costs[.]

There is no language here awarding prejudgment interest to Ms. Gretzky. Thus, where the consent judgment does not stipulate (and specifically leaves out) prejudgment interest, Ms. Gretzky is bound by this language. It is anticipated that Ms. Gretzky will assert that the provision providing that "Victoria Gretzky releases Manuel Arruda and Madalena Arruda from any personal liability beyond the limits of Policy No. MABP159913 plus legal interest and agrees to take no action to collect a judgment against their assets in excess of any available liability insurance coverage" supports the

---

[2]    Along the same lines, your letter's claim that "AmGuard's counsel advised that Ms. Gretzky could only receive AmGuard's check if her counsel sign additional terms outlined in her July 19, 2024, letter" is patently incorrect. The letter states, in pertinent part, that "AmGuard will immediately reissue a check to your clients devoid of such words; but **only upon acknowledgement that you and your client will abide by your prior written agreement**, to wit: 'Victoria Gretzky releases Manuel Arruda and Madalena Arruda from any personal liability beyond the limits of Policy No. MABP1559913 plus legal interest and agrees to take no action to collect a judgment against their assets in excess of any available liability insurance coverage." (Emphasis supplied with bolding and italics). Thus, contrary to your claim, the July 19, 2024 letter did not request additional terms but simply asked Ms. Gretzky to abide by the terms to which she had already agreed. As such, this assertion is meritless.

Gregory P. Sorbello, Esq.
September 12, 2024
Page 6

awarding of prejudgment interest. However, the vague reference to "legal interest" does not stipulate a specific prejudgment interest award, nor does it state that AmGuard is to pay it. Accordingly, your letter's assertion that prejudgment interest is owed is erroneous.[3]

Lastly, we must note that your citation to c. 93A and demand for payment of triple the amount of the total settlement in the form of a "consent judgment" along with attorney's fees is also erroneous. That provision applies once three things have occurred: (1) there is a judgment in the underlying case; (2) the insurer has not made a reasonable offer in relation to the injury actually suffered in response to the demand letter; and (3) there is a finding at trial that the insurer's conduct was knowing or willful. In this case, none of these things has occurred. As discussed above, the consent judgment is a settlement agreement. Moreover, AmGuard has not violated c. 93A or c. 176D for the reasons set forth herein. Additionally, as discussed below, AmGuard has already paid its policy limits under the Policy (as it agreed to do); but is hereby making an additional reasonable offer in response to your letter.

To that point, and solely for the purpose of this response, assuming *arguendo* that you could prove a violation of c. 176D (which for the reasons set forth above you cannot), Ms. Gretzky would only be entitled to the loss of use of money under relevant decisional law. As a court recently put it, "[t]he 'injury actually suffered' in unfair claim settlement practice cases ordinarily includes damages for loss of use of the money wrongfully held. 'The reasonableness of the ... offer must be judged in relation to 'the interest lost on the money wrongfully withheld by the insurer, compensating claimants for the costs and expenses directly resulting from the insurer's conduct.' " Wahlstrom v. Zurich Am. Ins. Co., 2022 WL 20416910, at *4 (D. Mass. Nov. 22, 2022) quoting Calandro v. Sedgwick Claims Mgmt. Servs., 264 F. Supp.3d 321, 324 (D. Mass. 2017). In other words, in a successful case, "[t]he money wrongfully withheld is the "money that should have been, but was not, offered" by the insurer to the plaintiff." Id. quoting Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 567 (Mass. 2001). It must also be noted that attorney's fees are not considered as part of the "injury actually suffered" in determining whether a settlement offer is reasonable. See id.

AmGuard vehemently denies that it has violated c. 93A or c. 176D. Nevertheless, in an effort to resolve this matter in full, AmGuard offers your client an additional **$232,769.16**. To calculate this amount, AmGuard considered the following: (1) the date that settlement should have allegedly taken place, in the view of the plaintiff or her counsel; (2) the amount; and (3) the interest rate. Taking these points in reverse order, "[t]he loss of use calculus requires only the use of a 'fair rate' of interest, rather than any particular interest rate." Wahlstrom, 2022 WL 24016910, at *7 (holding 3.39% "was a reasonable interest rate as a matter of law at that time."). Here, AmGuard will choose instead to apply a more generous interest rate of 12% which is more than reasonable as a matter of law. Moving on, AmGuard applied this interest rate to the amount of $1,000,000 which is the policy limit on the AmGuard Policy that was paid to Ms. Gretzky on behalf of its insureds. Lastly, AmGUARD applied this interest rate from the date Gretzky Action was filed (September 1, 2022) (the soonest possible date it could have settled the claim under any scenario) to the date that the settlement check was received by you (August 8, 2024). We encourage you and your client to consider this offer in light of

---

[3]    Relatedly, because the consent judgment is a settlement agreement, prejudgment interest is not owed under the relevant language of the AmGuard Policy concerning supplementary payments. As such, your assertion that AmGuard misrepresented its policy provisions is devoid of merit.

PEABODY
& ARNOLD

Gregory P. Sorbello, Esq.
September 12, 2024
Page 7

the key decisional law interpreting M.G.L. c. 93A and c. 176D, including its safe harbor provision. Thus, AmGuard hereby offers to Ms. Gretzky **$232,769.16** in exchange for a release of her claims against AmGUARD under c. 93A and c. 176D.

In sum, for all the foregoing reasons, AmGuard must reject the claims in your letter. It fails to establish AmGuard's liability under both the facts and the law. However, AmGuard hopes that Ms. Gretzky will accept the above good-faith settlement offer to put this matter fully to rest. AmGuard reserves the right to raise all defenses to your purported c. 93A/176D demand and allegations contained therein, whether or not explicitly set forth herein. After you have had an opportunity to review this letter, we are willing to discuss this matter with you at any time. Also, if you have additional information or legal authority you would like AmGuard to review in connection with this matter, please send such to us.

Sincerely,

Tamara Smith Holtslag

Lincoln A. Rose

# EXHIBIT C



756 Eddy Street
Providence, RI 02903
Phone 401.777.7777 | Fax. 401.383.5005
www.BottaroLaw.com

January 31, 2025

**VIA CERTIFIED MAIL & EMAIL** (TSmith@peabodyarnold.com, lrose@peabodyarnold.com & Steven.Dyki@GUARD.com)

Tamara Smith Holtstag                Steven Dyki
Lincoln Rose                         Berkshire Hathaway Guard
Peabody & Arnold, LLP                Empire State Building
600 Atlantic Avenue                  350 5ᵗʰ Avenue, Suite 4520
Boston, MA 02210                     New York, NY 10118
tsmith@peabodyarnold.com             Steven.Dyki@GUARD.com
lrose@peabodyarnold.com

RE:    *Victoria Gretzky v. Manuel Arruda, et al*
       Bristol County, MA Superior Court; Civil Action No. 2273CV00595

Dear Counsel:

This demand letter is sent on behalf of Victoria Gretzky as assignee of Manuel and Madalena Arruda (the "Arrudas"), who hereby makes demand for payment of damages sustained because of AmGuard's first party bad faith insurance practices in its defense of the above-captioned matter. This demand is sent in compliance with M.G.L. c. 93A § 9(3). On July 8, 2024, you indicated that your firm represented AmGuard Insurance Company "relative to [the Gretzky action]." In consideration of Rule 4.2 of the Massachusetts Rules of Professional Conduct, Ms. Gretzky is sending this correspondence to your firm instead of communicating this demand directly to known AmGuard representatives. If you do not represent AmGuard for any derivative claims arising from the Gretzky action, please notify me immediately so that this demand can be served upon the correct person.

In support of her demand, please consider the following events:

- September 26, 2021 – Victoria Gretzky suffers significant injuries to her lower extremities after a fall that occurred at the apartment building owned by Manuel and Madalena Arruda, Defendants in the underlying action.

- September 29, 2022 – Attorney Sorbello sent a letter to Attorneys Wallen and O'Connor entitled "M.G.L. c. 93A and 176D NOTICE" via email. This letter informed counsel that Ms. Gretzky had incurred over $250,000 in medical expenses and demanded payment for her pain and suffering. The letter further outlined the Defendants' insurance company's unfair claims settlement practices in violation of M.G.L. c. 93A and 176D, specifically § 3(9)(b), (c), (e), and (n).

- October 11, 2022 – Attorney Sorbello's office sent Ms. Gretzky's medical records and bills to Attorney Wallen via e-mail.

- November 7, 2022 – Attorney Wallen sent the AmGuard policy to Attorney Sorbello, disclosing the $1,000,000 policy limits for the first time.

- On November 21, 2022 – Attorney Sorbello sent a letter to Attorneys Wallen and O'Connor making demand for the $1,000,000 policy limits. This demand outlined the Arrudas' breach of the warranty of habitability and various building code violations. The demand also included the specific injuries and treatment Ms. Gretzky had endured as a result of the accident.

- January 27, 2023 – Attorney Sorbello sent Plaintiff's Motion to Amend Complaint to AmGuard via certified mail. The proposed Amended Complaint outlined the facts of the accident, Ms. Gretzky's injuries, and the Arrudas' negligence, including their clear breach of the warranty of habitability. The proposed amendment also outlined AmGuard's unfair claims settlement practices in violation of M.G.L. c. 93A and 176D, specifically § 3(9)(d), (f), and (n).

- February 6, 2023 – AmGuard received the proposed Amended Complaint.

- March 3, 2023 – Attorney Sorbello sent an updated Plaintiff's Motion to Amend Complaint to AmGuard. The updated version contained the same allegations regarding the facts of the accident, Ms. Gretzky's injuries, and AmGuard's statutory violations. The motion was ultimately not presented to the Court.

- October 31, 2023 – Attorney Sorbello sent an e-mail to Attorneys O'Connor and Telese forwarding the report prepared by Todd Thomas, Plaintiff's building code and life safety rules expert. Mr. Thomas outlined several building code violations regarding the subject stairway.

- December 15, 2023 – The parties submitted their Joint Pretrial Memorandum to the Court, which outlined Plaintiff's two additional experts, Dr. Walter Panis and Cheryl Kaufman. These experts' reports were delivered to Attorneys O'Connor and Telese prior to the submission of the memorandum. The reports outlined Ms. Gretzky's future treatment needs and costs to be incurred because of the accident.

- February 29, 2024 – Attorneys O'Connor and Telese convey AmGuard's first offer to settle for $60,000.

- March 25, 2024 – Attorney Sorbello sent a letter to Attorney O'Connor making demand for the $1,000,000 policy limits. This demand outlined the Arrudas' breach of the warranty of habitability and various building code violations. The demand also included a recitation of Ms. Gretzky's specific injuries, total bills for treatment incurred to-date, and future treatment costs.

- ·March 27, 2024 – Attorney O'Connor sent an e-mail to Attorney Sorbello indicating he "was in touch with the carrier [AmGuard] today…The carrier's rep would like us to focus on [mediation] or [trial] in the next couple of weeks."

- April 8, 2024 – Attorney Sorbello sent an e-mail to Attorney O'Connor declining mediation and re-urging Ms. Gretzky's prior demands.

- April 22, 2024 – Attorney O'Connor sent Attorney Sorbello an e-mail advising he had "been given $100K in authority by AmGuard to rekindle [settlement] discussions. Am led to belief [sic] this is not the last offer it will make. My impression is that a counter will trigger another offer." No new evidence had been obtained between the this offer and the initial offer.

- May 2, 2024 – Attorney O'Conner sent Attorney Sorbello an e-mail advising "[AmGuard] has given me the ok to offer $200K in an effort to elicit a counter. Am informed there is substantial room to move." No new evidence had been obtained between the this offer and the initial offer.

- May 9, 2024 – Prior to the final pre-trial conference, Attorney O'Connor called Attorney Sorbello and extended a $700,000 settlement offer. He further indicated he was "trying to get the million" from AmGuard. No new evidence had been obtained between the this offer and the initial offer.

- May 10, 2024 – AmGuard's Vice President of Litigation, Steven Dyki, sent Attorney Savoie a letter indicating his belief that the matter had settled for $1,000,000 the previous day, and he had "instructed counsel [O'Connor] to take appropriate action to enforce the agreed-upon settlement." As instructed by AmGuard, O'Connor filed a motion to enforce the alleged settlement, which the Court denied a few hours later. Attorney Dyki also indicated that AmGuard would only pay prejudgment interest awarded against the insured on the part of the judgment AmGuard pays, pursuant to the policy language.

- May 14, 2024 – Ms. Gretzky and the Arrudas agree to a consent judgment in the amount of $2,250,000, expressly reserving Ms. Gretzky's rights to pursue both first- and third-party bad faith claims against AmGuard.

- June 26, 2024 – Judgment is entered by the Court against the Arrudas.

## AMGUARD'S 93A AND 176D VIOLATIONS

M.G.L. c. 93A governs the regulation of business practices for consumer protection. Chapter 93A authorizes any Massachusetts consumer to bring an action against an insurance company for unfair or deceptive practices as provided in M.G.L. c. 176D. Here, AmGuard has committed the following violations of Chapter 176D § 3(9):

- **(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue** – AmGuard's Vice President of Litigation advised Ms. Gretzky's

3

counsel, in writing, that "…AmGUARD notes that in the event of a judgment against our insured, AmGUARD will pay prejudgment interest awarded against the insured on the part of the judgment we pay, pursuant to our policy language." AmGuard refused to pay the policy limits plus interest and protect the assets of the Arrudas.

- **(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies** – For months, Ms. Gretzky's counsel repeatedly made demand upon AmGuard through the Arrudas' assigned counsel for payment of the insurance policy limits. Ms. Gretzky's counsel provided supporting medical records, bills, and expert reports over the course of 18 months. Despite this satisfactory proof of loss, AmGuard never made a good faith offer to settle.

- **(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies** – AmGuard failed to conduct a prompt investigation of Ms. Gretzky's claim based on the above-referenced timeline. AmGuard's substandard and untimely investigation placed the Arrudas at risk of an excess judgment.

- **(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information** – AmGuard failed to timely pay Ms. Gretzky's claim after receiving a satisfactory proof of loss based on the above-referenced timeline. AmGuard's substandard and untimely investigation placed the Arrudas at risk of an excess judgment.

- **(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear** – Ms. Gretzky's counsel outlined the various building code violation and warranty of habitability breaches to the Arrudas' assigned counsel just one day after the Arrudas appeared and filed their Answer. Ms. Gretzky's counsel continued to outline this clear theory of liability in follow-up letters and the amended complaint that was served on AmGuard in early 2023. Further, the delivery of Plaintiff's expert report on October 31, 2023, made liability crystal clear. Neither the Arrudas nor AmGuard ever retained an expert to dispute these opinions. Despite this clear liability, AmGuard waited several months before even making its first low-ball offer. AmGuard's claim resolution strategy placed the Arrudas at risk of an excess judgment.

## VICTORIA GRETZKY'S DEMAND (AS THE ARRUDAS' ASSIGNEE)

AmGuard has intentionally, knowingly, willfully, and repeatedly violated Masschusetts laws against unfair and deceptive practices in the business of insurance. As such, Ms. Gretzky hereby demands payment of the judgment, legal interest, and statutory penalties provided in M.G.L. c. 93A and 176D, specifically:

- Payment of the Judgment in excess of AmGuard's $1,000,000.00 policy limits, i.e., $1,250,000.00;
- Payment of legal interest on the entire judgment owed by AmGuard and the Arrudas;
- Payment of three times the total judgment against its insureds, $6,750,000.00, for AmGuard's willful and knowing statutory violations;
- Payment of attorneys' fees in the amount of $1,500,000.00.

Pursuant to Chapter 93A § 9(3), this demand will remain open for 30 days. If the demand is not accepted by Monday, March 3, 2025, at 5:00 p.m. eastern time, then it will be deemed withdrawn, and Ms. Gretzky (as the Arrudas' assignee) will file a formal action against AmGuard for recovery of these payments and penalties.

## AMGUARD HAS NO REASONABLE EXCUSE FOR ITS FAILURES AND DECISIONS

Ms. Gretzky and the Arrudas anticipate AmGuard will attempt to defend its failures by pretending it did not receive sufficient notice of Ms. Gretzky's claim, and thus, it could not properly evaluate its merits for settlement purposes. This is demonstrably false.

At a minimum, AmGuard received Plaintiff's proposed amended complaint via certified mail on February 6, 2023. The amended complaint set forth Ms. Gretzky's undisputed theories of liability and attendant damages.

Further, the communications to Attorney O'Connor and his co-counsel are imputed to AmGuard. While Attorney O'Connor appeared in the underlying suit on behalf of the Arrudas, he was presumably assigned and paid by AmGuard. Throughout the litigation, Attorney O'Connor indicated, in writing, that he "was in touch with the carrier;" that "[AmGuard's] rep woud like us to focus on [mediation] or [trial];" that he had "been given $100K in authority by AmGuard to rekindle [settlement] discussions;" and that he had been "given the ok to offer $200K" by AmGuard. Even Vice President of Litigation Dyki described his "instruction" to Attorney O'Connor to file motions on AmGuard's behalf to enforce a settlement that never was.

On paper, Attorney O'Connor was the Arrudas' counsel. In reality, Attorney O'Connor was AmGuard's agent. Any communications to him or his partners and associates will be imputed to AmGuard, and Ms. Gretzky is confident that formal discovery will fully reveal how involved AmGuard was or should have been in the adjustment of this case.

Beyond that putrid defense, AmGuard has no justifiable excuse for its failures and unscrupulous decisions that placed the Arrudas at an unnecessary risk of an excess judgment.

## NOTICE TO PRESERVE AND NOT DESTROY ANY DOCUMENTARY EVIDENCE

In the event AmGuard does not timely meet Ms. Gretzky's demand, please be advised that Ms. Gretzky (as the Arrudas' assignee) intends to file suit against AmGuard for payment of the judgment, legal interest, costs, attorneys' fees, and penalties pursuant to M.G.L. c. 93A and 176D. You are hereby notified to preserve any written documents, e-mails, text messages, video messages, adjustment notes, photographs, records, bills, or other communications sent or received by AmGuard's agents, employees, subsidiaries, or counsel regarding the claims made by Victoria Gretzky. Further, you are hereby notified to preserve any communications between AmGuard, any attorney acting on its behalf, and the Arrudas regarding the claim and lawsuit filed by Ms. Gretzky. Any destruction or failure to preserve these materials will be considered spoliation of material evidence.

Sincerely,

Gregory P. Sorbello, Esq.

# EXHIBIT D



PEABODY
&ARNOLD

Tamara Smith Holtslag
(617) 951-2012
tsmith@peabodyarnold.com

Lincoln A. Rose
(617) 951-2069
lrose@peabodyarnold.com

February 28, 2025

**Via Email With Electronic Delivery Confirmation: Greg@bottarolaw.com**

Gregory P. Sorbello, Esq.
Bottaro Law Firm LLC
756 Eddy Street
Providence, RI 02903

Re:  **Insured:**    Manuel & Madalena Arruda
     **Policy No.:**  MABP254155
     **Matter:**    Victoria Gretzky v. Manuel Arruda, et al., Civil Action No. 2273CV00595,
                 Bristol County Superior Court (the "*Gretzky Action*")
     **Claim No.:**   MABP254155-001-001-001

Dear Attorney Sorbello:

As you know, this office represents AmGUARD Insurance Company ("AmGUARD") in connection with the above-referenced matter. This responds to your letter of January 31, 2025 which purports to be a demand letter by your client, Ms. Gretzky, as assignee of the Arrudas, pursuant to M.G.L. c. 93A and c. 176D. Nothing stated herein is an admission of liability or that your letter complies with the requirements of M.G.L. c. 93A. AmGUARD reserves the right to raise any and all defenses to your client's claims, whether or not specifically set forth herein.

AmGUARD denies that it violated M.G.L. c. 93A or c. 176D, or any other law, with respect to its defense of its insureds, Manuel and Madalena Arruda, against your client's claims. This is because, simply stated, under the relevant facts and law, the alleged liability of Arrudas was never reasonably clear; and as such, AmGUARD was never obligated or required to settle your client's claims. AmGUARD rightfully and appropriately afforded a defense to its insureds under their policy of insurance relative to your client's claims. In so doing, AmGUARD met its contractual and legal obligations to the Arrudas and conducted itself as a prudent insurer by: (a) providing the Arrudas with skilled counsel in defense of the *Gretzky Action*; (b) duly investigated and assessed the claim from start to finish; (c) offered to pay and did pay the policy limits under the Arrudas' policy to your client; and (d) obtained a release from your client in exchange for the payment of the liability limits to protect its insureds, the Arrudas. Accordingly, AmGUARD must once again reject your letter's assertions and your client's demands.

PEABODY
&ARNOLD

Gregory P. Sorbello, Esq.
February 28, 2025
Page 2

While your January 31, 2025 letter asserts that it is a demand due to AmGUARD's "first party bad faith insurance practices in its defense of the [*Gretzky Action*]," the letter is nearly identical, word for word, to your letter of August 13, 2024 which was sent on behalf of Victoria Gretzky alleging that AmGUARD engaged in third-party bad faith practices in violation of M.G.L. c. 176D.[1] Where your January 31, 2025 letter repeats the same allegations and assertions contained in your prior August 13, 2024 letter, AmGUARD hereby incorporates by reference its response letter dated September 12, 2024 as if it were fully stated herein. That response letter, as you know, set out the longstanding law in Massachusetts as it pertains to an insurer's obligations on behalf of its insured(s), as well as to claimants, and how an insurer is not obligated to effectuate a settlement of a claim unless and until liability is "reasonably clear." A copy is enclosed for your ease of reference. As stated therein, as Massachusetts law has reiterated time and again, an insurer need only have a "reasonable belief" that liability is not clear to insulate itself from liability under M.G.L. c. 176D, §3(9)(f) for electing not to effectuate a settlement. See Bolden v. O'Connor Café of Worcester, Inc., 50 Mass. App. Ct. 56, 67 (2000). "So long as the insurer acts in good faith, the insurer is held not to the standards of omniscience or perfection; it has leeway to use, and should consistently employ, its honest business judgement." Bolden, 50 Mass. App. Ct. at 67 citing Peckham v. Continental Cas. Ins. Co., 895 F.2d 830, 835 (1st Cir. 1990). AmGUARD's September 12, 2024 letter further addressed in detail how, in the *Gretzky Action,* the Arruda's defense counsel consistently challenged both fault and damages and intended to introduce evidence disputing both aspects of the case at trial. Thus, AmGUARD was under no obligation pursuant to M.G.L. c. 176D to effectuate a pre-trial settlement with your client.

Likewise, in AmGUARD's September 12, 2024 letter, again fully incorporated by reference here, it cited various legal authorities that supported the manner in which it investigated and assessed your client's claim during discovery and leading up to trial. As stated, AmGUARD, approaching a trial for its insureds and its corresponding unpredictability, exercised its good faith business judgment and offered (and paid) its policy limit to Ms. Gretzky on behalf of its insureds, which she accepted. There was no lack of good faith or "extortionate tactics" which would form the basis for a c. 93A/176D action based on unfair settlement practices.  Guity v. Com. Ins. Co., 36 Mass. App. Ct. 339 at 344, 631 N.E.2d 75, 77 (1994). There can be no violation of M.G.L. c. 93A/176D where AmGUARD exercised its honest business judgment and made good faith settlement offers to Ms. Gretzky under Massachusetts law. Your last demand fails to address the applicability of such decisional law here.

Instead, your most recent letter just repeats what was said before. Indeed, the only additional allegations that you muster in support of your most current claim that AmGUARD committed first-party c. 176D violations are that, in your opinion, AmGUARD's allegedly conducted a

---

[1]    Your January 31, 2025 letter is also disingenuous insofar as it states the following, even though you have already filed suit against our client AmGUARD and entered your appearance for Ms. Gretzky on February 19, 2025: "*Pursuant to Chapter 93A § 9(3), this demand will remain open for 30 days. If the demand is not accepted by Monday, March 3, 2025, at 5:00 p.m. eastern time, then it will be deemed withdrawn, and Ms. Gretzky (as the Arrudas' assignee) will file a formal action against AmGuard for recovery of these payments and penalties.*"

PEABODY
&ARNOLD

Gregory P. Sorbello, Esq.
February 28, 2025
Page 3

"substandard and untimely investigation" and that its "claim resolution strategy placed the Arrudas at risk of an excess judgment." However, in similar circumstances, Massachusetts courts have rejected such allegations as sufficient to support "bad faith" by an insurer who is providing a faithful defense to its insured(s). For instance, in Silva v. Norfolk & Dedham Mut. Fire Ins. Co., 2015 WL 13037587 (Mass. Super. Aug. 12, 2015), the insured assigned her rights to the claimant after an adverse verdict against her and the claimant brought suit against her insurer, Norfolk & Dedham. Id. at 18-19. Just like Ms. Gretzky, the claimant alleged that "Norfolk & Dedham breached its duty to [the insured] in its handling of the potential excess liability against her." Id. at *27. The Court rejected the claimant's claim and held that:

> because liability was not reasonably clear prior to the verdict, Norfolk & Dedham was not obligated to place a settlement offer on the table. Post-verdict, Norfolk & Dedham did act to protect [its insured] by appealing the judgment, albeit unsuccessfully, while simultaneously offering its policy limits in exchange for a release. Norfolk & Dedham ultimately settled for the policy limits and obtained a release of [its insured] in exchange for an assignment of her rights against the insurance company. Accordingly, [the claimant] has not proven by a preponderance of the evidence that Norfolk & Dedham violated Chapter 93A in its defense of [its insured] and handling of the excess verdict.

Id. (Internal citations omitted). With Silva as a guide, AmGUARDS's defense of its insureds in the *Gretzky Action* is clearly proper under M.G.L. c. 93A and/or c. 176D and decisional law. Indeed, unlike in Silva, the *Gretzky Action* resolved prior to a jury verdict. Moreover, AmGUARD, like Norfolk & Dedham, paid its policy limits and did not oppose the assignment of rights to Ms. Gretzky. As a result, your client received the full amount payable under the terms of the Arruda's insurance policy, and the Arrudas were released from the *Gretzky Action*. The same result in Silva is dictated here where AmGUARD defended its insureds, paid its policy limits to the plaintiff on behalf of the insureds, and, in exchange, the insureds were released from liability. Accordingly, contrary to your letter's conclusory assertions, AmGUARD did not violate M.G.L. c. 93A and/or c. 176D with respect to its handling of the *Gretzky Action.*

Last, we note that your most recent demand does not even address or respond to AmGUARD's prior offer to Ms. Gretzky, as set out in detail in its September 12, 2024 letter. As you know, notwithstanding the fact that AmGUARD vehemently denies that it has violated c. 93A or c. 176D, it made a post-settlement additional offer to your client to resolve this matter in full. Said offer, which comprised an additional **$232,769.16** in compensation to your client, is not addressed at all in your demand. Rather, you make other monetary demands that are not supported by the facts or Massachusetts law. Without waiver of AmGUARD's position stated on September 12, 2024 and

PEABODY
&ARNOLD

Gregory P. Sorbello, Esq.
February 28, 2025
Page 4

herein, said **$232,768.16** remains offered in exchange for a release of all claims against AmGUARD under M.G.L. c. 93A and c. 176D.[2]

In sum, for all the foregoing reasons, AmGUARD must once again reject the claims in your letter. It fails to establish AmGUARD's liability under both the facts and the law. Notwithstanding, please inform us if your client wishes to accept AmGUARD's settlement offer of $232,769.16. AmGUARD reserves the right to raise all defenses to your purported c. 93A/176D demand and allegations contained therein, whether or not explicitly set forth herein. After you have had an opportunity to review this letter, we are willing to discuss this matter with you at any time. Also, if you have additional information or legal authority you would like AmGUARD to review in connection with this matter, please send it to us and we will review it.

Sincerely,

Tamara Smith Holtslag

Lincoln A. Rose

TSH/mh
Enclosure as stated

---

[2]      It is worth noting, however, that this offer by our client is erroneously characterized in the Complaint that was recently filed against AmGUARD. There, the Complaint alleges that "[o]n September 12, 2024, [AmGUARD] responded to Ms. Gretzky's written demand with an offer to pay the judicial interest owed on the Judgment." Even a cursory review of the bases behind AmGUARD's settlement offer evinces that your allegation is erroneous. As explained in AmGUARD's September 12, 2024 letter, in so-called "bad faith" cases (without waiver of AmGUARD's position that it never engaged in such practices), "[t]he 'injury actually suffered' in unfair claim settlement practice cases ordinarily includes damages for loss of use of the money wrongfully held. 'The reasonableness of the ... offer must be judged in relation to 'the interest lost on the money wrongfully withheld by the insurer, compensating claimants for the costs and expenses directly resulting from the insurer's conduct.'" Wahlstrom v. Zurich Am. Ins. Co., 2022 WL 20416910, at *4 (D. Mass. Nov. 22, 2022) quoting Calandro v. Sedgwick Claims Mgmt. Servs., 264 F. Supp.3d 321, 324 (D. Mass. 2017). As such, AmGUARD determined a settlement offer based on the loss of use calculus set forth by Massachusetts courts and explained the reasoning behind the amount offered. AmGUARD did not, as alleged in the Complaint, "offer to pay the judicial interest owed on the Judgment."